# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| PATRICIA THOMPSON, § § § Plaintiff, § § v. § § § UKG INC., D/B/A ULTIMATE § KRONOS GROUP, § § Defendant. § | CIVIL ACTION NO. _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT & JURY DEMAND

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Patricia Thompson ("Plaintiff" or "Ms. Thompson") sues Defendant Ultimate Kronos Group ("Defendant" or "UKG") for discrimination based on race and retaliation for her protected activity, and respectfully shows the following:

### I. SUMMARY

Ms. Thompson began working for UKG on January 9, 2023, as Lead Services Project Manager. For the duration of her employment, Ms. Thompson gave her best efforts to UKG and her clients. Unfortunately, Ms. Thompson quickly began to face discrimination on the basis of her race. Ms. Thompson is a Black woman. UKG initially placed her in a lower-ranking role, despite her vast qualifications, in order to promote a less-qualified White employee. UKG then failed to give her the same training as similarly situated White employees. In her role, the company purposely assigned her notoriously difficult accounts, typically to fix the mistakes of the previous

account managers, who were all White. UKG was setting Ms. Thompson up to fail based on her race.

When Ms. Thompson complained to UKG regarding the discrimination she faced, UKG began retaliating against her by making her out to be the stereotypical "angry Black woman," and by placing her on administrative leave on June 8, 2023. In other words, UKG acted as though it were investigating a complaint *against* her instead of *by* her. While Ms. Thompson was on leave, UKG did not conduct any substantive investigation of Ms. Thompson's claims and took absolutely no steps to address the situation with Ms. Thompson or the other UKG employees. The hostility and retaliation by UKG ultimately reached a crescendo on August 7, 2023, when UKG terminated Ms. Thompson's employment.

## II. PARTIES

1. Plaintiff Thompson is an individual who resides in Dallas County, Texas.

2. Defendant UKG is a Delaware corporation with its principal place of business in Weston, Florida. Its Texas office is located in Dallas County, Texas. Defendant may be served through its registered agent for service of process in Texas, CT Corporation System, at 1999 Bryan St., STE 900, Dallas, Texas 75201.

## III. JURISDICTION AND VENUE

3. This Court has jurisdiction to hear the merits of the claims under 28 U.S.C. § 1331.

4. This Court has supplemental jurisdiction to hear the merits of state claims pursuant to 28 U.S.C. § 1367, these claims being so related to the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

5. This Court's exercise of personal jurisdiction over Defendant is appropriate because at all times relevant to Plaintiff's claims, it was doing business in the State of Texas. Per the Texas Long

Arm Statute, Section 17.042 of the Texas Civil Practice and Remedies Code, UKG recruited Texas residents for employment inside the state of Texas through its various locations throughout the state (including Plaintiff's work location in Dallas County). Further, an exercise of jurisdiction will not offend traditional notions of fair play and substantial justice.

6. Venue is proper in the district and division under 28 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Dallas County.

## IV. FACTS

7. Ms. Thompson is a Black woman.

8. Ms. Thompson began working for UKG on January 9, 2023, as Lead Services Project Manager under Director of Professional Services Elizabeth Barner (White).

9. In her role as Lead Services Project Manager, Ms. Thompson was responsible for planning, managing, and successfully implementing new projects for large, complex customers.

10. Ms. Thompson was the only Black Project Manager in the Public Sector Department at UKG.

11. From the beginning of her employment at UKG, Ms. Thompson faced discrimination on the basis of her race.

12. Ms. Thompson began Self-Paced Training for the first 90 days of her employment with UKG.

13. However, other similarly situated White new hires in her department were given virtual one-on-one instructors and were later paired with seasoned Program Managers to aid in their success at UKG.

14. For example, Senior Project Manager Maggie Snow (White) and Senior Project Manager Abbey Walters (White), who were hired at or around the same time as Ms. Thompson, were both given one-on-one training with virtual instructors and paired with seasoned Program Managers.

15. UKG did not afford Ms. Thompson such opportunities.

16. For the duration of her training period, Ms. Barner continually pushed Ms. Thompson to finish her training by the end of the month (January)—in less than 30 days—because she "had projects waiting," despite the fact that the training and probation period was supposed to last 90 days.

17. Upon information and belief, no White new hires in Ms. Thompson's department were required to skip two-thirds of their training.

18. On February 2, 2023, Ms. Thompson had a meeting with Ms. Barner, Christopher Carlton, Senior Director, and Eric Richter, Manager.

19. During the meeting, Mr. Carlton stated that he had hired Ms. Thompson for Mr. Richter's team, not Ms. Barner's team.

20. Mr. Carlton shared that, despite Ms. Thompson's qualifications, he had promoted Lauren Deller (White) to a higher-level position and placed Ms. Thompson in Ms. Deller's lower-level position on Mr. Richter's team, who also is less qualified than Ms. Thompson.

21. Ms. Thompson has over 35 years of experience, over 20 of which are at a management level, including project management, compared to Ms. Deller's approximately 10–15 years of experience (she is 33 years old). Mr. Richter also has only approximately 10-15 years of experience.

22. In fact, despite Ms. Deller and Mr. Richter being in higher-level positions, they were assigned to support Ms. Thompson on several projects.

23. Ms. Thompson was moved from Ms. Barner's team to Mr. Richter's team on February 2, 2023.

24. The discrimination only escalated from there.

25. Mr. Richter routinely assigned Ms. Thompson clients who had previously been assigned to White employees. These clients were notoriously difficult, nonresponsive, and had budgets that were extremely difficult to reconcile.

26. For example, Ms. Thompson was assigned Ms. Deller's client, the City of Detroit, on February 13, 2023.

27. The client was nonresponsive, yet Ms. Thompson was tasked with balancing the budget.

28. On March 9, 2023, Ms. Thompson was assigned Passaic Valley, formerly the client of Alex Sherrod (White). Ms. Deller was assigned to support Ms. Thompson.

29. The account was a disaster. The budget was extremely out of balance.

30. Ms. Thompson was tasked with reconciling the budget that Mr. Sherrod had mismanaged.

31. On the Passaic Valley project, Ms. Thompson found herself shouldering the responsibilities of both her own role and that of Ms. Deller.

32. Ms. Thompson reported this to Mr. Richter, expressing not only the challenge of picking up the slack from Ms. Deller, but also of being compelled to undertake tasks that extended beyond the typical scope of her position.

33. This additional workload not only consumed valuable time that Ms. Thompson could have allocated to her training and other clients, but also posed a considerable strain on her overall responsibilities.

34. Mr. Richter was dismissive of Ms. Thompson's concerns and instructed her to compile a comprehensive list of Ms. Deller's errors.

35. Ms. Thompson had already alerted Mr. Richter to each error upon its occurrence, but she acquiesced with Mr. Richter's request nonetheless.

36. Despite being tasked with duties beyond the scope of her position, Ms. Thompson worked tirelessly on these accounts to rectify the mistakes of the previous managers.

37. On April 7, 2023, Ms. Thompson's 90-day training and probation period was complete, although her actual training had halted on January 31, 2023, when Ms. Barner had pushed her to begin working on projects before her training was complete.

38. On April 18, 2023, Ms. Thompson was assigned Dallas County, former client of Christine Renauld (White).

39. The client had complained about Ms. Renauld's lack of involvement, and the case was reassigned to Ms. Thompson.

40. Again, the account was a disaster, and the budget was a nightmare to reconcile.

41. Mr. Carlton told Ms. Thompson and Mr. Richter that she (Ms. Thompson) only had to "oversee" the account.

42. On April 26, 2023, Ms. Thompson reported to Mr. Carlton that she could not get Dallas County's budget balanced, due to the mistakes of the previous manager, and requested his assistance.

43. Mr. Carlton stated that he would look at it right away but did not offer any assistance or send help until May 2, 2023.

44. In late April or early May of 2023, Ms. Thompson communicated her difficulties reconciling the Dallas County account to Erik Stone (White), Senior Integration Consultant.

45. On May 5, 2023, Mr. Stone removed himself from the Dallas County account without Ms. Thompson's knowledge.

46. The same day, Ms. Thompson also reported her difficulties with the Dallas County account to Mr. Carlton.

47. In response, Mr. Carlton removed her access to OpenAir. OpenAir is a project management system that organizations use to plan, track, and manage their project portfolios from inception to completion. Access to it is essential to Ms. Thompson's ability to do her job, and removing her access to it made it difficult to do her job.

48. When Ms. Thompson reported to him that she could not access the software, he told her that she "didn't need it."

49. Mr. Carlton became aggressive and began using racial stereotyping language toward Ms. Thompson.

50. In particular, Mr. Carlton told her to "stand down and stop fighting," blatantly suggesting that Ms. Thompson was the stereotypical "angry Black woman," being overly aggressive at work rather than a dedicated employee trying to do her job.

51. The discrimination continued to escalate following this incident.

52. Mr. Richter intentionally, discriminatorily interfered with Ms. Thompson's access to the Dallas County account, making it impossible for Ms. Thompson to do her job.

53. Additionally, Mr. Richter's tone and behavior began to change in his interactions with Ms. Thompson.

54. Specifically, Mr. Richter began to be cold and dismissive of Ms. Thompson's concerns.

55. Ms. Thompson even asked Mr. Richter if he was acting like that out of retaliation for reporting her difficulties.

56. Mr. Richter dismissed Ms. Thompson's concerns, stating that the conversation was "not a productive use of time."

57. On May 17, 2023, Mr. Richter threatened Ms. Thompson's employment, stating that her role may not be the role for her if she was not willing to perform her "duties."

58. On May 18 through May 19, 2023, Ms. Thompson took a mental health break, due to the huge emotional drain caused by the discrimination she faced at work.

59. On May 22, 2023, as any employee should, Ms. Thompson engaged in protected activity and filed a complaint with Pat Wadors, Chief Human Resources Officer, regarding the race discrimination she was facing at UKG.

60. Her complaint stated that leadership had been consistently insulting her intelligence and condescending to her and that she had been made to feel attacked, disrespected, underappreciated, inferior, and devalued as an individual and specifically as a person of color by the leadership at UKG.

61. Ms. Thompson went on to state that leadership had created a hostile work environment, where she felt dismissed, threatened, and stereotyped as the "angry Black woman."

62. Further, Ms. Thompson pointed out that she was having to do vastly more work outside the scope of her duties than similarly situated colleagues, that she had previously reported this to her manager, Mr. Richter, and that his response was to threaten her job.

63. Ms. Thompson reported that all this hostility and race discrimination culminated in her need to take mental health days on May 18–19, 2023. Excerpted below.

In the midst of battling with the decision to escalate Dallas County to HR, I was hit with the reality that leadership would never fully support me on May 17, 2023. I informed my manager, Eric Richter, that leadership is requiring me to perform manager/director duties outside of my job description which includes turning around and single-handedly managing Dallas County's client escalated account. As a result, Eric threatened my job when he told me that my role may not be the role for me if I don't want to perform manager/executive duties (mainly his duties) and your Lead PM duties. He also offered me a conversation with HR which is the reason I am reaching out to you.

Additionally, I am concerned that I could be committing UKG career suicide (termination) by escalating the Dallas County issues and reporting maltreatment to UKG HR. I have also expressed concern about Lauren Deller, Program Manager, errors and not having the HRMS experience to provide advanced level support with Passaic Valley. Passaic is a complex project and is also an escalated client who has to be implemented before an end-of-life product – the client requesting an aggressive go-live as well. As with Eric Richter, Lauren Deller was also aligned with me to learn. Collectively, leadership is insulting my intelligence and being condescending at best. Leadership's actions against me make me feel attacked, disrespected, underappreciated, inferior, and devalued as an individual and person of color. What recourse do I have for simply performing management/director-level duties too well besides quitting? My salary was not commensurate when I was hired. Therefore, why am I required to function as a high-performing manager/director for free?

Considering I am a newly hired employee, learning and honoring our company mission, vision and values, leadership should have done the "right thing" at offer and aligned me with an appropriate title, compensation, bonus structure, etc. that is equitable and fair for my consulting and broad range of experience, skill-set, education, dual certifications, and more that the department and organization are currently benefiting from if they needed my level of expertise to train/coach/mentor managers/executives, troubleshoot/research bad accounts, rectify seasoned PMs troubled accounts/budgets, negotiate client payments for budget deficits (Dallas County), turnaround/reconcile client escalated accounts, client relationship management, advise on departmental HR/HRIS matters, and more. **I am the only employee in Public Sector that has a dual certification specialty skill set and several years of experience implementing HRMS projects.** From what I have speedily learned, UKG is not in the non-profit business, nor am I, currently. Leadership's actions toward me do not align with our culture, mission, vision, and values.

Leadership has created the old cliché hostile work environment and it is mentally and physically impacting me as I had to take mental health days on May 18 & 19, 2023.

3. A new partner vendor was not offered or used to replace Delaero Inc on the Dallas County project. We placed Erick Stone with Peter Gambino after we could not Peter Nagy (all from the same partner vendor). The client is not aware of the partner vendor.
4. Leadership's actions against me make me feel attacked, disrespected, underappreciated, inferior, and devalued as an individual and person of color.
5. I have been required to work or return early when sick.
6. I train, coach, mentor, and advise managers/executives.
7. Ladened with troubled accounts/budgets transitioned from seasoned PMs.
8. My duties do not align with my title and compensation, and I am being retaliated against for informing leadership of the disparity – job threatened, forced to perform unreasonable amounts of work coupled with the fact I am a newer external PM still in training, forced to perform manager/executive level work, denied tenured program manager support, left to single-handedly manage escalated issues, and more.
9. I was not allowed to negotiate my compensation at offer but much of the work being performed is not in my job description. Ask my UKG recruiter if I tried to negotiate and was told UKG does not offer sign-on bonuses and my offer is a good offer for the work I will be performing.
10. I have made several requests to Erick Richter to support aligning program management expertise with the Passaic Valley project. Recently leadership gave Eric Richter a directive to have Lauren Deller, Passaic's Program Manager, replaced with a seasoned Program Manager. The directive has not occurred to date (May 17, 2023). After Eric received the directive he still asked me to detail the reasons and prove Lauren Deller lacks the experience. Lauren was promoted from Lead PM (my role on Eric's team) to Program Manager. My previous experience with Lauren Deller's (PgM) erroneous information and HRMS knowledge has resulted in the loss of trust that she can adequately support me as a Program Manager. Eric Richter's lack of basic managerial and project management skills including threatening my job has resulted in the loss of trust and confidence that he can successfully lead teams with large-scale enterprise complex projects as well as resolve client escalated accounts without assistance.
11. Leadership treats me differently from other new hires.
12. I do not have a work-life balance. I work long hours, rarely eat lunch and occasionally substitute appointments in place of lunch.
13. An internal anonymous source prematurely leaked the internal UKG PM transition strategy to external Nebraska Project team members. An uncomfortable situation for me and the other impacted UKG PM as we were confronted in client meetings. What purpose would it serve for both client PMs to confront me and the other UKG in two (2) separate meetings?

Thank you,
Patricia Thompson, PHR, PMP, MMHRM

64. In addition, Ms. Thompson later learned from another similarly situated colleague, Maggie Snow (White), that Ms. Snow had been able to negotiate her pay.

65. Ms. Thompson was discriminatorily not permitted to do the same.

66. On May 22, 2023, Stephanie Haggard, HR Consultant, began an investigation of Ms. Thompson's complaint.

67. Ms. Haggard scheduled a call with Ms. Thompson for May 26, 2023.

68. On May 26, 2023, Ms. Haggard and Grace Murillo, Director of Legal, interviewed Ms. Thompson regarding her complaint.

69. Instead of being impartial, Ms. Murillo was aggressive and dismissive of Ms. Thompson's concerns about discrimination and retaliation.

70. On June 8, 2023, Ms. Thompson met with Ms. Haggard and Ms. Murillo again.

71. During the meeting, they spent approximately two hours questioning Ms. Thompson.

72. Ms. Thompson reiterated that she continued to be retaliated against by her managers.

73. Later that same day, Ms. Haggard and Ms. Murillo called Ms. Thompson again.

74. During the call, they discriminatorily and retaliatorily placed Ms. Thompson on administrative leave.

75. They instructed her not to speak to anyone at UKG during her leave.

76. There had been no mention of administrative leave during their first meeting.

77. Ms. Thompson asked if Mr. Carlton, Mr. Richter, Ms. Deller, or any of the UKG employees she had reported as acting discriminatorily and retaliatorily were also being placed on administrative leave.

78. Ms. Haggard responded by admitting that she had not spoken to anyone else yet.

79. Ms. Thompson pointed out that her being the only one placed on leave was discriminatory and retaliatory in itself.

80. That same day, Ms. Thompson followed up with an email to Ms. Haggard, Ms. Murillo, and Ms. Wadors, reiterating the sentiments she had expressed during the meeting, i.e., the

continued discrimination and retaliation by her managers and that placing only her on leave was discriminatory.

81. She also provided proof of emails from Mr. Richter displaying retaliatory behavior.

82. On June 20, 2023, after over two weeks with no follow-ups or updates on the investigation by UKG, Ms. Thompson emailed Ms. Haggard, Ms. Murillo, and Ms. Wadors, pointing out that her complaint had gone unanswered and that UKG had done nothing to address it.

83. Ms. Thompson shared the toll the situation was taking on her mental health, making her feel alienated from her colleagues because she was told not to speak to her peers or clients while on leave.

84. On June 22, 2023, Ms. Thompson was diagnosed with work-related anxiety by her primary care physician.

85. On July 3, 2023, Ms. Haggard notified Ms. Thompson that their investigation was complete and that UKG did not find any discrimination or retaliation, despite all the evidence Ms. Thompson had presented.

86. Ms. Thompson remained on administrative leave until August 7, 2023.

87. On August 7, 2023, Ms. Thompson's employment was terminated, by Leigh Slayne, Assistant General Counsel, via email.

88. There was no stated reason for her termination.

89. That same day, UKG reinstated her employment after Ms. Thompson shared that she would be proceeding with filing a lawsuit. She was given 24 hours to report back to work, under the same managers that had discriminated and retaliated against her.

90. For obvious reasons, Ms. Thompson declined to accept her former position at UKG. Importantly, Ms. Thompson had already been terminated and was only reoffered her position when it became clear to UKG that Ms. Thompson intended to pursue a legal remedy.

91. From the beginning of Ms. Thompson's employment, UKG was setting Ms. Thompson up to fail based on her race.

92. The true reasons Ms. Thompson was terminated were because of her race and protected activity, in violation of Title VII of the Civil Rights Act of 1964 and the Texas Labor Code.

## V. CONDITIONS PRECEDENT

93. On September 18, 2023, Ms. Thompson timely dual-filed charges of discrimination with the Equal Employment Opportunity Commission, EEOC Charge No. 451-2023-09779, and the Texas Workforce Commission—Civil Rights Division

94. On November 3, 2023, Ms. Thompson received her right to sue from the EEOC.

95. Ms. Thompson now timely files suit, as she files this complaint within 90 days of receiving notice of her right to sue from the EEOC.

96. All conditions precedent for bringing this suit have been met.

## VI. CAUSES OF ACTION

### A. Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964.

97. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

98. Plaintiff is an employee within the meaning of Title VII.

99. Defendant is an employer within the meaning of Title VII.

100. As described above, Defendant UKG's actions, including terminating Ms. Thompson, were because of her race, and constitute unlawful discrimination in violation of the 42 U.S.C. § 2000e-2(a), et seq.

101. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII.

102. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to continue to suffer pecuniary losses, including but not limited to lost wages and loss of other benefits associated with her employment.

103. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

104. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages.

105. Additionally, Plaintiff seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful discrimination.

106. Defendant's actions referenced above have caused Plaintiff to retain the services of undersigned counsel in order to pursue her federal and state rights in this action. Consequently, Plaintiff seeks attorney's fees, expert costs, and other costs of this suit.

### B. Race Discrimination in Violation of the Texas Labor Code.

107. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

108. Plaintiff is an employee within the meaning of the Texas Labor Code.

109. Defendant is an employer within the meaning of the Texas Labor Code.

110. As described above, Defendant UKG's actions, including terminating Ms. Thompson, were because of her race, and constitute unlawful discrimination in violation of Chapter 21 of the Texas Labor Code.

111. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under the Texas Labor Code.

112. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to continue to suffer pecuniary losses, including but not limited to lost wages and loss of other benefits associated with her employment.

113. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

114. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages.

115. Additionally, Plaintiff seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful discrimination.
Defendant's actions referenced above have caused Plaintiff to retain the services of undersigned counsel in order to pursue her federal and state rights in this action. Consequently, Plaintiff seeks attorney's fees, expert costs, and other costs of this suit.

### C. Race Discrimination in Violation of Section 1981.

116. Plaintiff incorporates all preceding paragraphs as if fully restated herein.

117. Plaintiff was denied equal rights and benefits because of her race in violation of 42 U.S.C. § 1981.

118. Defendant denied Plaintiff equal rights through discriminatory acts when, among other acts, it terminated Plaintiff because of her race.

119. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and expects to continue to suffer pecuniary losses, including but not limited to lost wages and loss of other benefits associated with her employment.

120. As a result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer non-pecuniary losses, including but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

121. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages.

122. Additionally, Plaintiff seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful discrimination.

123. Defendant's actions referenced above have caused Plaintiff to retain the services of undersigned counsel in order to pursue her federal rights in this action. Consequently, Plaintiff seeks attorney's fees, expert costs, and other costs of this suit.

    **D.**     <u>**Retaliation in Violation of Title VII and § 1981.**</u>

E. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

F. As described above, Defendant's actions constitute unlawful retaliation on the basis of Plaintiff's protected activities of complaining of discrimination, in violation of 42 U.S.C.

§2000e-2(a) and 42 U.S.C. § 1981. The employment practices complained of above were intentional.

G. Plaintiff has satisfied all jurisdictional prerequisites in connection with her claims under Title VII and § 1981.

H. As a result of Defendant's unlawful retaliation, Plaintiff has suffered and expects to suffer pecuniary losses, including but not limited to, lost wages and other benefits associated with her employment.

I. As a result of Defendant's retaliation, Plaintiff has suffered non-pecuniary losses including, but not limited to emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

J. Defendant acted at all relevant times with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff therefore seeks punitive damages under 42 U.S.C. §§ 1981 and 1981a.

K. Additionally, Plaintiff seeks any and all equitable relief necessary to return her to the position that she would have been in but for Defendant's unlawful retaliation.

L. Defendant's actions referenced above have caused Plaintiff to retain the services of the undersigned counsel in order to pursue her federal rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of suit under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-5(k).

## VII. JURY DEMAND

M. Plaintiff Patricia Thompson makes a demand for a trial by jury on all issues, claims, and defenses in this action.

## VIII. PRAYER

WHEREFORE, Plaintiff Patricia Thompson respectfully requests that Defendant Ultimate Kronos Group be cited to appear and answer, and that, after trial by jury, Plaintiff take judgment against Defendant as follows:

  a. Judgment against Defendant ordering it to take such reasonable actions as may be necessary to remedy the effects of Defendant's violations of law;

  b. Judgment against Defendant for lost wages and benefits, both back pay and front pay;

  c. In the alternative to front pay, judgment against Defendant placing Plaintiff in the position of employment she would have enjoyed but for the discrimination, if deemed feasible;

  d. Judgment against Defendant for compensatory damages including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

  e. Injunctive relief as appropriate;

  f. Judgment against Defendant for punitive damages to the extent allowed under the law;

  g. Pre-judgment interest at the appropriate legal rate on all amounts awarded;

  h. Interest after judgment at the appropriate legal rate on all amounts awarded until paid in full;

  i. Judgment against Defendant for Plaintiff's reasonable attorneys' and experts' fees;

  j. Costs of suit; and

  k. Such other and further relief to which Plaintiff may justly be entitled.

Respectfully submitted,
**ROB WILEY, P.C.**

*/s/ Ellen T. Johnston*
By: Ellen T. Johnston
Texas Bar No. 24136927
(awaiting admission *pro hac vice*)
ejohnston@robwiley.com

Rachel Bethel
Texas Bar No. 24133095

Robert J. Wiley*
Texas Bar No. 24013750
*Board Certified – Labor and Employment*
*Law – Texas Board of Legal Specialization*

**LAW OFFICE OF ROB WILEY, P.C.**
2613 Thomas Avenue
Dallas, Texas 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511

**ATTORNEYS FOR PLAINTIFF**